UNITED STATES of America, Plaintiff,

v.

202.76 ACRES OF LAND, MORE OR LESS, IN THE COUNTY OF MERCER, STATE OF NORTH DAKOTA, Duane Payton, et al., and Unknown Owners, Defendants.

Civ. No. A1-76-65.

United States District Court,
D. North Dakota,
Southwestern Division.

Oct. 6, 1977.

J. C. Blaisdell, Hazen, N. D., for claimant Stanton Park Dist.

Alfred C. Schultz, Bismarck, N. D., for the claimant Estate of Rickey Schreiber.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

This matter arises out of the condemnation by the United States of lands lying near the confluence of the Knife and Missouri Rivers. The problem has to do with the claims of two competing landowners, the Rickey Schreiber Estate and the Stanton Park District, to portions of the lands lying between the rivers.

The lands are being taken in order to preserve extensive Mandan Village sites. The group of Mandan Villages was a well established trade center in 1804 and 1805, when Lewis and Clark wintered across the river and four miles downstream at Fort Mandan. This portion of Dakota Territory was surveyed under the Rectangular System of Governmental Land Surveys in 1882.

The original plat of Township 144, Range 84, Section 6, looked like this:

(Exhibits 7 and 28)

In 1882 the Knife River cut Lot 1 in two equal segments and cut off the northeast corner of Lot 4. The Schreibers claim that the Missouri River by accretion built out the east half of Lot 1, and then built south to encompass the addition to Lot 4. Thus, the Estate of Rickey Schreiber claims it is entitled to the accretion which lies east of Lot 4. The Stanton Park District claims that it is entitled to the accretion east of Lot 4, asserting that the Missouri did build accretion off of Lot 4, and that they hold the lands east of Lot 4 under doctrine of adverse possession.

The United States has, as part of its survey for taking purposes, surveyed the accretion, and given that accretion east of Lot 1, survey number 01–146, and that accretion east of Lot 4, survey number 01–147. Their survey looks like this:

(Exhibit 4)

Both lots went out of the public domain by homestead patent to Thomas McGrath on November 20, 1883. He had purchased his Receivers Receipt on February 15, 1883, and platted the town of Stanton on March 27, 1883, encompassing Lots 3, 4, 5, 6 and 7, of Section 6, all before he had proved up. First as to the matter of accretion:[1]

In 1891, the Missouri River was surveyed in considerable detail, and strip maps were published reflecting the survey. The relevant strip map series, charts numbered 107, 108 and 109 have been received as Court exhibits numbered 52, 53 and 54, respectively. Both the strip maps and the government taking map (Exhibit 4), are at the scale of 1″ = 1,000′, so comparison of them is simple. Also, both maps show the location of the line between Townships 145 and 144, and the location of the Mercer County Courthouse.

Mr. Borner, 87 years old and sound of mind, wind and limb, testified that he had lived his life in the Stanton area and on a rough map (Exhibit 38), marked where he had worked as a stevedore to unload steamboats at Stanton. In 1905 he unloaded west of Loy (Stanton) Island, at a point that would appear to be due east of the hotel (Exhibit 52). By 1908 the unloading point had moved up river on the Missouri from a quarter to a half mile north of the original unloading site (Exhibits 38 and 52). River steamboats of the era, for example, the Far West which figured in the Custer debacle, could move up to a five hundred ton payload in twenty-two inch shallows.[2] From these facts and a study of Exhibit 30, it appears that the Missouri-Knife channel east of Stanton closed between 1891 and 1908, and river docks were then moved to about the township line.

■ It also is clear that substantial sandbars developed east of both Lots 1 and 4 as early as 1891. Since the parties stipulated that the Knife River is not a navigable stream, these sandbars accreted to Lot 1 east of the Knife River, and where Lot 2 did not extend east of the Knife, to those portions of Lot 2, west of the Knife River. In North Dakota the riparian owner owns the bed of a nonnavigable stream. *State v. Brace,* 76 N.D. 314, 36 N.W.2d 330, at page 332.

■ There remains only the question of whether the Estate of Rickey Schreiber has established its claim that the Missouri River built land from Lot 1 east and south to encompass all land east of Lot 4. I find it did not. The sandbars which became the foundation of the accreted land are east of both Lots 1 and 4. And the hydraulics of alluvial deposit are not consistent with Schreiber's concept. The fast waters of the Missouri, when joining the slower waters of the Knife would necessarily show down the waters of the Missouri and speed up the waters of the Knife. Thus, the pattern of deposit would be first east, then south. And the Missouri, of all streams, never has done anything in an orderly manner. That is, deposits could well gravitate east, then east, then south, then east, and so on. Therefore, I conclude that the accretion east of Lots 1 and 4 belongs to the owner of Lots 1 and 4 respectively. That is, tract 01–147 has accreted to Lot 4 and belongs to the owner of Lot 4, which is the Park District of the City of Stanton.

The best objective evidence available confirms this analysis. Paul K. Weiser, Soil Classifier, concluded that the soil deposition in the area was east rather than south (Exhibit 37). Elmer H. Worthington, Forester, by the use of borings, concluded that tree number 1, a cottonwood, with a ten foot circumference, was 190 years old in 1977. Tree number 2, with a twelve foot

---

1. An excellent article dealing with special concepts in this field of law, and going on to a particular problem not involved here, is found in Volume 43, Number 3, North Dakota Law Review, page 429. It is entitled "The Wandering Missouri River, a Study in Accretion Law" by Robert E. Beck.

2. The Far West, a stern-wheeler, built at Pittsburgh, Pennsylvania in 1870, was 190 feet long and 33 feet wide. The engines had a 15 inch bore with a 5 foot stroke. She could move 500 tons of freight in 22″ of water. Source: Frank E. Vyzralek, Archivist, State Historical Society of North Dakota.

circumference, located fifty feet northeast of tree number 1, was 153 years old in 1977 (Exhibits 40 and 41). Both of these trees are located on tract 01–147. Both trees were standing before Lot 4 went out of the public domain, and tree number 1 was standing when Lewis and Clark wintered at Fort Mandan.

■ Also, on the evidence, I hold that the owner of Lot 4 has acquired the land east of Lot 4 under principles of adverse possession. While the Schreibers have paid taxes consistently on Lot 1, the tax statements show no expanded description to encompass the land east of Lot 4. So the tax statements really prove no issue in this case. And the record reflects numerous examples of the exercise of dominion by the Park Board of the City of Stanton reaching back to the early 1930's and extending to the present. For example, the land was leased by the Park Board as early as 1947 (testimony of Bud Allen). Further, as Exhibit 15 disclosed, this lease arrangement continued at least through 1953. Bud Allen farmed the land, which surely is notice of an adverse claim asserted under the authority of the Park Board. Leases to the Russells have continued into the 1970's. Without further detailing the evidence, the record shows possession in an open and notorious manner to the present. The area was clearly delineated by a fence line which was occupied by a fence off and on from the time that Mr. Borner ran cattle on the land in the 1920's and 1930's to the present. That fence line was laid between Lots 1 and 4 and extended east. The line is easily seen in Exhibit 32, and is in line with the "forty" line to the west.

■ It is well established that public corporations can acquire property by adverse possession. *Suck v. Benton Township,* 246 Iowa 1, 66 N.W.2d 434 (Iowa 1954), *Independent Sch. Dist. No. 40, Nowata County v. Allen,* Okl., 446 P.2d 282 (1968). The North Dakota statute governing acquisition of title by adverse possession when possession is not based upon a written instrument is 28–01–11 NDCC, which provides:

"For the purpose of constituting an adverse possession by a person claiming title not founded upon a written instrument nor upon a judgment or decree, land shall be deemed to have been possessed and occupied only in the following cases:

    1. When it has been protected by a substantial inclosure; or

    2. When it has been usually cultivated or improved."

The applicable limitation statute against adverse ownership claimed by North Dakota or political subdivision is 40 years, 28–01–01 NDCC:

"The state of North Dakota will not sue any person for or in respect to any real property of the issues or profits thereof by reason of the right or title of the state to the same, unless:

    1. Such right or title shall have accrued within forty years before any action or other proceeding for the same shall be commenced; or

    2. The state or those from whom it claims shall have received the rents and profits of such real property or of some part thereof within the space of forty years."

See, *Rosedale School Dist. No. 5 v. Towner County,* 56 N.D. 41, 216 N.W. 212 (1927); and *Peterson v. United States,* 384 F.2d 664 (1967) at 668, which contains an offhand intimation to the contrary.

Since the history of adverse possession reaches back to the 1930's, I do find that under principles of adverse possession, the owner of Tract 01–147 is the Stanton Park District.

This memorandum and order is deemed to satisfy the requisites of Rule 52(a) of the Federal Rules of Civil Procedure.

Counsel for the Stanton Park District will forthwith prepare and submit appropriate form of judgment in conformity herewith.